UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 12-cr-00158** |
| **VERSUS** | **JUDGE HAIK** |
| **TIAN LEI TANG(01)** | **MAGISTRATE JUDGE HANNA** |

**Report and Recommendation**
*(Doc. 146)*

Before the undersigned is the Motion to Dismiss Indictment [Rec. Doc. 146] filed by Tian Lei Tang (a/k/a Tom). Oral argument was heard on the motion on September 18, 2013 and an evidentiary hearing was conducted on November 1, 2013.  Following a status conference, the record was supplemented by the parties on January 16, 2014. [Rec. Doc. 174] Based on the evidence presented, the applicable law, the arguments of counsel, and for the reasons set out below, it is the recommendation of the undersigned that the motion be denied without prejudice to the defendant's right to re-urge the motion following trial on the merits.

*Factual and Procedural Background:*

On August 16, 2012, three defendants, including Tian Lei Tang  were subjects of a Superseding Indictment, charging each with violations of provisions

of 8 U.S.C. §1324, namely conspiracy to harbor certain aliens (Count 1) and harboring aliens (Count 2). [Rec. Doc. 30-31][1]  In Count One, it is alleged that Tang is a registered agent/director of two corporations doing business as Buffet City in Lafayette, Louisiana.  Beginning before November, 2008, and continuing through the date of the superseding indictment, it is alleged that Tang and the two other defendants, "and with others known and unknown" unlawfully combined, conspired, confederated and agreed together to circumvent the U.S. immigration laws by concealing, harboring or shielding from detection certain illegal aliens. Together, the defendants are alleged to have hired many illegal Hispanic workers to work in the kitchen of the Buffet City restaurant. [Rec. Doc. 31]

    Tang contends that the government plans to sustain its burden of proof against him with evidence that thirteen illegal aliens were employed by the three indicted defendants, were concealed, harbored, and/or sheltered by them, and that the defendants' conduct substantially facilitated the aliens remaining in the United States illegally.  Tang contends that he did not knowingly or intentionally conceal, harbor, or shelter any of the illegal aliens; he did not know they were in the United States unlawfully, and he did not facilitate their remaining in the country unlawfully. [Rec. Doc. 146-1, p. 2]  Of the thirteen alleged aliens, five were

---

[1] Da Dong Ye (a/k/a Frankie) has entered a guilty plea. [Rec. Doc. 125, 127]  Hua Can Ye (a/k/a Jackie) and Tang will proceed to trial in March, 2014.

deported without being interviewed by the government[2]; one was interviewed December 15, 2008 and his whereabouts are unknown[3]; four were arrested and interviewed August 1, 2012, all but one of who were deported[4]; another was arrested on August 1, 2012 was not interviewed or deported[5], and two were deposed in September and December, 2012 one of whom has been deported[6]. [Rec. Doc. 146-1, pp. 2-3, Rec. Doc. 168 pp. 8-14, 45-50].

It is undisputed that of the thirteen alleged illegal aliens, all worked as kitchen workers and none worked in the dining room of the restaurant. Tang argues that the kitchen and dining room areas of the restaurant were operated completely separate from each other and that all hiring/supervision/compensation

---

[2] Jose Danilo Criba, Rodolfo Garcia, Jose Juan Mendoza, Jose Garcia-Rodriguez, and Daniel Hugo were arrested November 13, 2008. All have been deported and were not interviewed or deposed.

[3] Deyvin Alexis Ayala-Baquedana, a former kitchen employee, has been identified as a confidential informant who, Tang asserts, related facts that are exculpatory and support his defenses.

[4] Franklin Sanchez-Quesada, Jose Luis Nunez-Amador, Osmeri Salinas-Nerlin, and Hector Mendoza-Gomez were arrested and interviewed by the government on August 1, 2012. All except Salinas-Nerlin have been deported.

[5] Reina Isabel Arteaga-Vasquez was also arrested August 1, 2012, but was not interviewed. She was released and has not been deported, however, per the defendant, her whereabouts are unknown as efforts to locate her at her last known address have been unsuccessful.

[6] Milton Milla-Mendoza was arrested August 1, 2012 and deposed with notice to the defendants on September 24, 2012. He has not been deported. Jose Orlando Cruz-Orellano was arrested February 7, 2012 and deposed with notice to the defendants on December 27, 2012. He has been deported.

of kitchen workers was the responsibility of Hua CanYe, and Tang had the same responsibility for the dining room staff. The kitchen workers believed they were working for Hua Can Ye (Jackie), and later for Da Dong Ye (Frankie)[7] and the dining room employees believed they worked for Tang.

Tang contends that he made sure that his dining room employees were legal and had proper I-9 reports but that Hua Can Ye did not do the same for the kitchen workers. A Form I-9 investigation by the government in November, 2009 showed that all of the dining room employees allegedly hired by Tang were lawfully in the United States, had proper credentials, and I-9 forms facilitated by Tang. There were no I-9s for the Hispanic workers in the kitchen. Tang has alleged these facts are supported by the government's confidential informant.[8]

Tang next argues that as of the date of the search of Buffet City on August 1, 2012, when six of the illegal aliens were arrested, the government knew the facts set out above. At that time, the government had the opportunity to interview all of the illegal aliens and to determine whether they had information which

---

[7] In April, 2010, Hua Can Ye and Tian Lei Tang sold their interests in Buffet City to Da Dong Ye, a/k/a Frankie.

[8] The undersigned has noted in previous rulings and the government has acknowledged that Tang was not mentioned in the telephone calls or in-person meeting arranged by the confidential informants Ayala and his American girlfriend. The female informant had no contact with Tang whatsoever. [Rec. Doc. 134] The Government has also reported that shortly after the meeting, Ayala fled the area, and it is not known if he remains in the United States. ICE has had no further contact with the female, and it is not known if she is still in the Lafayette area. [Rec. Doc. 118, p. 2]

would be favorable to the defendants. Yet, the government released one of the aliens without interview (Reina Arteaga-Vasquez) and interviewed four others using only a form list of questions.

    The four witnesses who were interviewed were all asked the same questions from a questionnaire prepared by the case agent, and no instructions were given to to conduct an interview outside of the questions contained on the form. [Rec. Doc. 168, p.47] Tang contends the questionnaires were inadequate in that the witnesses did not address the issues, or were simply not asked "the right or enough questions." [Rec. Doc. 146-1, p. 21] However, at least one of the witnesses interviewed by the government gave testimony consistent with Tang's defenses, indicating that he did not know anyone by the name of Tom. (Defendant's Ex. 3) Tang argues that this information was/is exculpatory and material, but the government did not inform the defendants or their counsel of the existence of the statement until October, 2012, and the statement itself was not provided to Tang until July 25, 2013, long after the witness, whose current whereabouts is unknown, was gone.

    The two other witnesses who were deposed by the government provided testimony that Tang argues is consistent with his defense, i.e. that he did not have responsibility for the kitchen workers and that there were separate operations

between the kitchen and dining room.[9] [Rec. Doc. 146-1, pp. 8-11].

Since the witnesses who were not deposed were not held long enough to notify defense counsel and give them the opportunity to interview and preserve testimony, Tang contends the government has deprived him of his ability to present exculpatory evidence at trial in violation of his Fifth Amendment right to due process and his Sixth Amendment right to compulsory process.

In response to the motion, the government concedes there was a division of responsibility between Tang and Hua Can Ye, with Tang managing the front/dining room part of the restaurant and Ye managing the kitchen. However, the government contends there was at all times one business organization–Buffet City. Further, the government contends that Tang handled all of the money for the organization, including payments for kitchen workers, given to Ye in cash, in envelopes for distribution to kitchen workers.

The government further argues that the motion calls upon the court to weigh in on wholly factual issues, making consideration of the motion at this time improper. The government next argues that the proffered evidence is not exculpatory, but is neutral, and the expected testimony is cumulative of the "deposed testimony" of Milton Milla-Mendoza and Jose Orlando Cruz-Millano,

---

[9]Cruz-Orellano has been deported but Milla-Mendoza has not, and efforts to locate him at his last known address apparently **have been successful**. (Rec. Doc. 174-1).

which is available for introduction at trial.  Nevertheless, the government is willing to stipulate that none of the deported aliens who worked in the kitchen at Buffet City had any interactions with Tang.  Since they had no interactions with Tang, they cannot offer information about the business relationship between Tang and Ye.

### *Applicable Law and Discussion*

Tang contends, and this Court agrees, that *United States v. Valenzuela*, 458 U.S. 858, 102 S. Ct. 3440 (1982), is controlling.  In that case, Valenzuela-Bernal moved to dismiss his indictment on the grounds that the government's deportation of two witnesses before they could be interviewed by the defense violated his Fifth Amendment right to due process of law and his Sixth Amendment right to compulsory process.  The motion was denied, and the defendant was found guilty.  The Ninth Circuit Court of Appeals reversed the conviction, finding that the government's deportation of alien witnesses before the defendant could interview them violated the defendant's rights to compulsory process under the Sixth Amendment and his Fifth Amendment right to due process of law.  The Supreme Court granted *certiorari* and noted that "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process' for obtaining *witnesses in his favor*." *Id.,* 458 U.S. 867 (emphasis in original). The

Court found that the defendant could not establish a violation of his constitutional right to compulsory process merely by showing that deportation of witnesses deprived him of their testimony, rather, the defendant "must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Id*. Although the specificity required for a showing of materiality was relaxed by the Court since the defense had no opportunity to interview the alien witnesses prior to their deportation, the Court nonetheless concluded that the defendant "can establish no Sixth Amendment violation without making some plausible explanation of the assistance he would have received from the testimony of the deported witnesses." *Id.* at 870-71.

The Court concluded that materiality is also consistent with, and therefore, required for claims brought under the Due Process Clause of the Fifth Amendment. *Id.* at 867-68, 872. Thus, the deportation of witnesses by the government does not violate the "fundamental fairness essential to the very concept of justice" unless the defendant can show how the testimony of the witnesses would have been "favorable and material." *Id.* at 872.

The Court recognized the dual responsibility of the Government to fulfill its obligation to prosecute criminal charges and at the same time deport other involved persons in order to carry out the immigration policies enacted by Congress - one of which is the "prompt deportation" of illegal aliens. In light of

the competing interests at stake, the Court summarized:

> [t]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executives' good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.
>
> Because prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess, however, the defendant cannot be expected to render a detailed description of the lost testimony. But this does not . . . relieve the defendant of the duty to make some showing of materiality. Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses. In some cases such a showing may be made based on agreed facts, and will be in the nature of a legal argument rather than a submission of additional facts. In other cases the criminal defendant may advance additional facts, either consistent with facts already known to the court or accompanied by a reasonable explanation for their inconsistency with such facts, with a view to persuading the court that the testimony of a deported witness would have been material and favorable to his defense.
>
> As in other cases concerning the loss of material evidence, sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). In making such a determination, courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence

>rather than the evidence itself. Because determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence.

*Id.* at 864-65, 872-74.

In *United States v. Gonzales,* 436 F.3d 560, 578 (5th Cir. 2006), the Fifth Circuit acknowledged as "universal" the "first prong" that the defendant show prejudice to his case under *Valenzuela-Bernal.* The court went further and cited cases from other circuits which recognize a second prong - that the defendant establish that the government acted in bad faith - based on the language that prompt deportation is justified by the "Executive's good-faith determination" that the illegal alien witnesses possess no evidence favorable to a defendant.[10]

The *Gonzales* court also cited a prior Fifth Circuit case, *United States v. Sierra-Hernandez*, 192 F.3d 501, 503 (5th Cir.1999), in which the court "discussed the first prong, acknowledged the existence of the second prong, and held there was no violation, noting that neither prejudice nor lack of good faith was shown, but not expressly stating that the failure to show lack of good faith

---

[10] The *Gonzales* court noted the Seventh, Ninth, and Tenth Circuits recognize that the defendant must establish that the government acted in bad faith. *United States v. Chaparro-Alcantara,* 226 F.3d 616, 624 (7th Cir.2000); *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir.2000); *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir.1997). Since *Gonzales,* the Sixth, and Eleventh Circuits have also adopted the requirement that bad faith be demonstrated. *United States v. Damra,* 621 F.3d 474, 487 (6th Cir. 2010) and *United States v. De La Cruz Suarez* 601 F.3d 1202, 1212-13 (11th Cir. 2010).

was of itself fatal to the claim." *United States v. Gonzales,* 436 F.3d 578.[11]

In *Gonzales,* the court discussed the issue of bad faith, and actually considered the defendant's failure to satisfy the second prong in denying relief under the plain error standard, but stated "[W]hether this court ever adopts the second prong, requiring a showing of bad faith by government officials, remains an open question that we do not decide today." *Id*. at 579.[12] Thus it remains unclear whether, in this circuit, bad faith on the part of the government must be demonstrated.[13] Acknowledging the lack of clarity, the undersigned conducted an evidentiary hearing on the issue of bad faith.

In 2010, the Sixth Circuit considered *Valenzuela-Bernal* and the Supreme Court's later decision in *Arizona v. Youngblood*, 488 U.S. 51(1988) to place the bad faith prong first in the analysis:

> *Youngblood*, then, can be read as modifying or clarifying *Valenzuela–Bernal* by adding a threshold requirement that any defendant arguing violation of his right of compulsory process—or any constitutional violation involving the loss of potentially exculpatory evidence—show that the government acted in bad faith (in, for example, deporting a potential witness). The Second, Seventh,

---

[11]*Cf. United States v. Romero-Cruz* 201 F.3d 374, 377-78 (5th Cir. 2000) where no bad faith showing was required of the defendant.

[12]See also *United States v. Calderon-Lopez* 268 Fed. Appx. 279, 291-92 (5th Cir. 2008) where the court declined to address the issue of whether the government deported the witness in bad faith since the defendant failed to satisfy the materiality/favorable prong.

[13]See *United States v. Hernandez* 347 F.Supp 2d 375, 380-381 (S.D. Tx. 2004) reaching the same conclusion.

> Ninth and Tenth Circuits have all viewed the decision in this light. . .
>
> We think that these circuits have correctly analyzed the effect of *Youngblood* on *Valenzuela-Bernal.* Accordingly to comply with this reading of these cases, we hereby modify our test for violations of compulsory process in the context of deported witnesses . . . to a two-prong test more in line with those stated by our sister circuits: in order to demonstrate that the government has violated his right of compulsory process, a defendant must first make an initial showing that the government has acted in bad faith, and, having made that showing, must then make some plausible showing that the testimony of the deported witness would have been both material and favorable to his defense.

*United States v. Damra,* 621 F.3d 474, 489-490 (6th Cir. 2010).

In *Gonzales,* the court stated:

> There may be some disagreement on what it takes to show bad faith. In the Ninth Circuit, a defendant must show either (1) that the government departed from normal deportation procedures or (2) that it deported the witness to gain an unfair tactical advantage. *Pena-Gutierrez*, 222 F.3d at 1085. In the Seventh Circuit, a defendant must show "official animus" or a "conscious effort to suppress exculpatory evidence." *Chaparro-Alcantara*, 226 F.3d at 624. The focus is on "the Government's knowledge when ... it arranged for the departure of the witnesses, not on any of its subsequent conduct." *Id*.

*United States v. Gonzales*, 436 F.3d 578.[14]

The evidence presented establishes that the government deported the illegal aliens pursuant to normal deportation procedures and the defendant does not seriously contest this. Rather the defendant contends the government's knowledge

---

[14] See also *United States v. Medina-Villa* 567 F.3d 507, 517-518 (9th Cir. 2009), *United States v. Dring* 930 F.2d 687, 695 (9th Cir. 1991).

that all of the aliens knew that Tang controlled/managed the dining room with properly documented workers and Ye controlled/managed the kitchen with illegal aliens suggests bad faith on the part of the government in obtaining the interview of some of the witnesses and then deporting them without notice to the defendants. However, this misreads the impetus of the Seventh Circuit jurisprudence in light of *Youngblood* which suggests that it is the government's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Chaparro-Alcantara,* 226 F.3d 624.

    Five aliens arrested by local law enforcement in 2008 were not interviewed at all before they were deported and no investigation had begun at that point. Thus it is unknown what, if any, information they may have had, whether exculpatory or not. There is no evidence they were deported by anything other than normal immigration procedures nor is there any evidence they were deported to gain a tactical advantage.  A sixth returned in an effort to cooperate at which time the government began to learn of the kitchen/dining distinction in personnel and management.  This gentleman's whereabouts is unknown as he fled the area, and thus the government did not cause him to be deported or otherwise made unavailable. Therefore, as it pertains to all of the illegal aliens arrested in 2008, it is this Court's finding that there is no evidence of bad faith under any potentially applicable standard.

Of the remaining seven, two were deposed with notice to defense counsel, four were interviewed and one was not. The one who was not interviewed or deposed has not been deported and her address has been provided to the defense. Of the four who were interviewed, three have been deported and one has not. The defense has been provided the last known addresses of the witness who has not been deported. That leaves for analysis only to the remaining three potential witnesses who were deported by the government.

Other than the information contained in the questionnaires, there was no evidence offered that any of the deported workers had any information beyond the kitchen/dining room distinction in personnel and in the management/control over the kitchen and dining room by Ye and Tang which the government readily concedes. One of the questionnaires indicates an illegal alien thought he was hired by "Tom" a/k/a Tang but was not sure. The questionnaire responses, in and of themselves, do not indicate that these three witnesses had exculpatory information beyond that which the government is prepared to concede. To the contrary, the all indicate essentially the same facts: (1) How each worker came to be illegally in the United States, (2) when and how they became employed at Buffet City, (3) who hired them, (4) information concerning their documentation, or lack thereof, (5) the circumstances under which they were paid, and (6) information concerning their transportation and lodging. The ROI's that were also

introduced into evidence do not offer any information that these witnesses had any information that was exculpatory beyond that which the government is willing to concede. Thus, this Court does not find that the witnesses had valuable exculpatory information applicable to Tang of which the government was aware at the time they were deported.

The evidence shows that these three witnesses were deported in accordance with normal immigration policies and there is no evidence that they were deported to gain an unfair tactical advantage. Therefore, to the extent the circuit requires a finding of bad faith, based on that which was adduced at the evidentiary hearing, this Court finds no evidence of bad faith on the part of the government and would recommend the motion be denied on that basis. However, out of an abundance of caution, the determination of whether the testimony of the deported witnesses is material, favorable to the defense and not cumulative will be undertaken without regard to the issue of bad faith.

Tang contends the plausible showing of materiality and favorable evidence to satisfy the first prong is demonstrated by the following:

a. For the six aliens arrested in 2008 by local law enforcement, the government failed to make any determination that they possessed no evidence favorable and material to the defense. However, with the attempted return of Ayala and the information gathered from him, it is plausible to assume that all six of the

witnesses possessed material and favorable information regarding the separate nature of the dining room and kitchen operations at Buffet City; that they all worked only in the kitchen of the restaurant for Ye without regard to their illegal status and that they had no employment involvement with Tang. The government contends this is cumulative of the information obtained in 2012.

b. If any of the six lied to Ye to get his job, that would be further evidence that Tang also would have been misled and hoodwinked by them, even if he had made inquiry, which was not his job as dining room manager. This is admittedly speculative but would not necessarily be cumulative.

c. Of those aliens actually interviewed by the government in 2012 after the original indictment had been returned, each was asked such sparse questions, it could not have reasonably been determined whether their testimony would be exculpatory to the defendant. At that time, the investigation had been ongoing for years and Tang's ownership interests in Buffet City was known to the government.

There is no indication that interviewers were instructed to question witnesses beyond the script. Of those witnesses who were interviewed, none were questioned on the issue presented by the government in its response to this motion - that Tang participated in running the business enterprise. There was no inquiry of the witnesses whether they had any information concerning Tang's involvement in the handling of money, payment of any other workers, or running the overall

business. It has also been alleged that Tang was involved in leasing the apartments and paying the rent where the aliens were housed. There is no discussion in the interviews concerning this subject although each was asked where they lived, how many lived with them and whether they paid any rent.

Thus on the basis of the questionnaire responses alone, it cannot be concluded whether these witnesses have information that is material and favorable to Tang that is not cumulative of the testimony in the depositions that were taken with notice to the defense. Rather, whether their testimony would be material, favorable to Tang and not cumulative would be purely speculative at this point. Therefore, this Court concludes that the district court would be better suited to make that determination after trial on the merits.

### *Conclusion and Recommendations*

While the Fifth Circuit has not yet specifically adopted a second "bad faith" prong to be demonstrated by the defendant in a *Valenzuela-Bernal* claim, those circuits who have analyzed it in light of the Supreme Court decision in *Youngblood* have included such a requirement. This Court concludes that, in light of the Fifth Circuit's comments in *Gonzales,* the weight of authority follows that line of reasoning and the Fifth Circuit would do likewise if presented with the issue. Therefore, this Court gave the defendant an opportunity to brief the issue and present evidence on the issue.

To the extent the district court agrees that bad faith must be demonstrated by the defendant, this Court recommends that the motion be denied as the evidence adduced does not demonstrate bad faith on the part of the government with regard to any of the deported witnesses under the standard set forth either by the Seventh or Ninth Circuits.

To the extent the district court does not agree that bad faith must be demonstrated, this Court cannot conclude without hearing the evidence adduced at trial that the three witnesses who were interviewed and deported in 2012 possessed information that is material and favorable to Tang and not cumulative of the deposition testimony of the other witnesses. Following the guidance of the Supreme Court, rather than defer ruling on the motion, it is the recommendation of this Court that the motion be denied, without prejudice to the right of the defendant to re-urge the motion following completion of the presentation of the evidence.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the

proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court, shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

    Signed at Lafayette, Louisiana this 4th day of February, 2014.

_____
Patrick J. Hanna
United States Magistrate Judge